UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NEUTRAL TANDEM, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| PEERLESS NETWORK, LLC; PEERLESS NETWORK | ) |
| OF ILLINOIS, LLC; and JOHN BARNICLE, | ) No. 08 C 3402 |
| | ) |
| Defendants. | ) Judge John W. Darrah |
| | ) |
| —————————————————————— | ) |
| | ) |
| PEERLESS NETWORK, LLC; PEERLESS NETWORK | ) |
| OF ILLINOIS, LLC; and JOHN BARNICLE, | ) |
| | ) |
| Counterclaim Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| NEUTRAL TANDEM, INC., | ) |
| | ) |
| Counterclaim Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Neutral Tandem, Inc. ("NT"), brought suit against Defendants,

Peerless Network, LLC; Peerless Network of Illinois, LLC; and John Barnicle (collectively,

"Peerless"), alleging infringement of NT's U.S. Patent No. 7,123,708 ("the '708 Patent"). The

Court held hearings on claims construction and NT's motion for a preliminary injunction on

November 19, 2009 and on November 30 through December 1, 2009, respectively. On

February 8, 2010, the Court issued a Memorandum Opinion and Order construing the claims of

the '708 Patent. The Court now rules on NT's motion for a preliminary injunction as follows.

The Court has considered the evidence, including the written declarations and testimony of the witnesses (including expert witnesses) and exhibits, and has further considered the proposed findings of facts and conclusions of law, the written arguments submitted by counsel for the parties and the authority cited therein. The Court weighed the testimony of each witness and determined whether the testimony was truthful and accurate (in part, in whole, or not at all) and decided what weight, if any, to give to the testimony of each witness. In making this determination, the Court considered, among other things: the ability and opportunity the witness had to see, hear, or know the things about which the witness testified; the witness's memory; any interest, bias or prejudice the witness may have; the witness's intelligence; the manner of the witness while testifying; and the reasonableness of the witness's testimony in light of all of the evidence in the case. *See* Fed. Civ. Jury Instr. 7th Cir. § 1.13 (2009).

## BACKGROUND FACTS[1]

The '708 Patent concerns the routing of telecommunications traffic in the Public

Switched Telephone Network ("PSTN"). The PSTN is the worldwide collection of

interconnected public telephone networks that was originally designed primarily for voice traffic.

For purposes of this motion, the PSTN is composed of transport elements and switching

elements. Transport circuits carry traffic from one location to another. Switching facilities allow

for connections between multiple users without the need to establish a dedicated transport circuit

between each pair of communicating partners. Without switches, each end user (i.e., each

---

[1]This case presents the use of several technical terms. Although each will be defined as
they appear in the opinion, the following glossary is included for convenience:

| | | |
|---|---|---|
| • | LEC | Local Exchange Carrier. A company providing local phone services. |
| • | ILEC | Incumbent Local Exchange Carrier. A local telephone company that was in existence at the time of the breakup of AT&T. |
| • | RBOC | Regional Bell Operating Company. RBOCs, also known as "Baby Bells," were created by the breakup of AT&T in 1984 and inherited the local telephone services of AT&T. For purposes of this order, the terms RBOC, ILEC and LEC will be used interchangeably. |
| • | CLEC | Competitive Local Exchange Carrier. A carrier that provides local phone services in competition with the ILEC. |
| • | IXC | Interexchange carrier. A long distance carrier. |
| • | PSTN | Public Switched Telephone Network. The worldwide collection of interconnected telephone networks, which was designed primarily for voice traffic. |
| • | LATA | Local Access and Transport Area. A particular geographic area, identified by a 3-digit number, covered by one or more LECs. "IntraLATA" refers to connections made between two local exchanges within the same LATA. "InterLATA" refers to a connection between a carrier in one LATA to a carrier in another LATA – essentially, a long distance call. The '708 Patent concerns IntraLATA calls. |
| • | CAPS | Competitive Access Providers. |
| • | IP | Internet Protocol. A transmission protocol for the transmission of data. |

telephone) would have to be connected via a dedicated line to every other end user. As the number of users connected to the network grows, a non-switched network quickly becomes prohibitively inefficient and expensive. Alternatively, each end user can make a single connection to a switch. The switch then makes the desired connection between any two end users when a call is placed.



Non-Switched Network                    Switched Network

In the PSTN, certain switches are not connected to end users but, rather, only to other switches. These switches, generally referred to as "tandem" switches, route traffic between other switches.

Historically, the architecture of the PSTN in the United States was managed by the former AT&T monopoly. The system was set up in a hierarchy with end users at the bottom level. Each end user was connected directly to an "end office," also known as a "Class 5

4

switch." In general, local calls would be routed from the end user initiating the call through the end office/Class 5 switch to the end user receiving the call. Typically, long distance calls would need to be routed further up the hierarchy to tandem switches. Class 4 switches, the tandem switches one level up, would route calls from one Class 5 switch to another. In general, the longer the distance a call traveled, the higher up the switching hierarchy it would move, proceeding to Class 3, Class 2, and Class 1 switches, as necessary.

Monopoly ownership of this hierarchy was broken up by the AT&T divestiture. Effective January 1, 1984, AT&T's local operations were split off into seven independent "Baby Bells," also called Regional Bell Operating Companies ("RBOCs").[2] Divestiture split the network between the Class 4 and Class 3 levels. AT&T was left with the long distance portion of the network – the Class 1-3 switches. The RBOCs took control of the local portion of the network – the Class 4 and 5 switches, as well as the facilities used to connect to individual end users of the network.

Further changes to the telecommunications landscape occurred in the mid 1990s. The Telecommunications Act of 1996 allowed the creation of CLECs, carriers that provide local phone service in competition with the RBOCs.

---

[2] For purposes of this order, the term RBOC will be considered equivalent to "ILEC" (Incumbent Local Exchange Carrier). RBOC or ILEC may also be equivalent to "LEC" (Local Exchange Carrier) when discussing the telecommunications industry before 1996. The Telecommunications Act of 1996 allowed for the creation of "CLECs" (Competitive Local Exchange Carriers), thereby necessitating the distinction between those that were preexisting (before divestiture) or "incumbent" and those that were the newly formed competitors of those incumbent LECs.

5

The network described in the '708 Patent concerns the efficient routing of transit traffic. Transit traffic is traffic between two telecommunication carriers that is carried by a third carrier. Historically, carriers have relied on the RBOCs' networks to carry transit traffic between them. For example, if a Sprint customer in Chicago placed a call to a Comcast customer in Chicago, the two carriers would rely on the local RBOC, Illinois Bell/Ameritech, to connect Sprint and Comcast to complete the call. The portion of the call carried on the RBOC network is transit traffic.

The '708 Patent notes several problems occasioned by use of the RBOC networks for transit traffic. First, RBOCs compete with other carriers for telephone subscribers. Thus, non-RBOC carriers were required to use a competitor's network and pay the RBOC competitor for use of that network. Furthermore, the RBOCs lacked incentive to improve service to the competitive carriers, for example, by upgrading to new technology. Finally, a competing carrier cannot access an RBOC's network at a single point. Rather, a competitive carrier must install a connection to every tandem switch in the RBOC's network. Figure 9 from the '708 Patent illustrates the necessary connections:

6



Figure 9 displays competitive carriers (CLECs, cable carriers, wireless carriers, IXCs[3] and

ILECs), shown on the left, each connecting to the tandem switches of the RBOC, shown on the

right. As Figure 9 illustrates, each carrier must connect to all of the RBOC's tandem switches

within the Local Access and Transport Area ("LATA").[4]

The network described in the '708 Patent, the Neutral Tandem Network ("NTN"),

provides carriers with an alternative to the RBOC network. The NTN provides carriers with a

single point off access, as shown in Figure 11 from the '708 Patent.

---

[3] An IXC, or "Interexchage Carrier," is a long distance carrier, e.g. MCI.

[4] A LATA is a particular geographic area, identified by a 3-digit number, covered by one
or more local exchange carriers. "IntraLATA" refers to connections made between two local
exchanges within the same LATA. "InterLATA" refers to a connection between a carrier in one
LATA to a carrier in another LATA -- essentially, a long distance call. The '708 Patent concerns
IntraLATA calls.

7



Ameritech LATA 357 Tandem Trunking Requirements

*FIG. 11*

The NTN provides other advantages over the RBOC network. The NTN allows carriers to use any type of traffic, including Internet Protocol ("IP")[5]. Additionally, because NT does not compete with carriers for customers, carriers using the NTN do not use a competitor's network to carry transit traffic.

NT alleges that Peerless infringes on claims 1, 2, 6 and 11 of the 708 Patent. Those claims state:

1. A Neutral Tandem Network ("NTN") that provides transit traffic amongst public and private wireline and wireless carrier networks, comprising:

at least one switch for cross-connecting each of a plurality of inputs to at least one of a plurality of outputs;

---

[5]Internet Protocol is a transmission protocol for the transmission of data.

a plurality of tandem access points for connection to switches of a plurality of said
public and private wireline and wireless carrier networks, said switches including
tandem switches; and

a network connecting said tandem access points to said at least one switch and
said network managing the efficient routing of transit traffic between said
plurality of tandem access points and said switch.

2. A Neutral Tandem Network as in claim 1, wherein at least one of said tandem
access points terminates incoming calls to an incumbent LEC tandem or central
office.

6. A Neutral Tandem Network as in claim 1, wherein said at least one switch
comprises a soft switch.

11. A Neutral Tandem Network as in claim 1, wherein said network comprises
fiber transport cable and a plurality of fiber terminals interconnecting said at least
one switch and said plurality of tandem access points.

## LEGAL STANDARD

Under Federal Circuit law, a party is entitled to a preliminary injunction if it shows:

"(1) a reasonable likelihood of success on the merits of its claims; (2) irreparable harm if an

injunction is not granted; (3) a balance of hardships tipping in its favor; and (4) the injunction's

favorable impact on the public interest. *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367,

1370 (Fed. Cir. 2005).[6] While no factor is dispositive, *Amazon.com, Inc, v.*

*Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir.2001) (*Amazon*), the movant must

show the first two factors – likelihood of success and irreparable harm – for an injunction to

issue. *Vehicular Technologies Corp. v. Titan Wheel Int'l, Inc.*, 141 F.3d 1084, 1088 (Fed. Cir.

1998). The decision to grant a preliminary injunction is within the sound discretion of the

district court. *Amazon*, 239 F.3d at 1350.

---

[6] Federal Circuit law applies to preliminary injunction motions in patent cases. *Mylan Pharmaceuticals, Inc. v. Thompson*, 268 F.3d 1323, 1329 n.1 (Fed. Cir. 2001).

In order to show a reasonable likelihood of success on the merits, NT must show that (1) NT will likely prove that Peerless infringes on the '708 patent, and (2) NT's infringement claim will likely withstand Peerless's challenges to the patent. *See Amazon*, 229 F.3d at 1350. The infringement analysis is a two-step process: first, the court must construe the claims; second, the construed claims are compared to the infringing device. *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003) *(Oakley)*.

Peerless claims the '708 Patent is invalid on the basis of obviousness. "A patent is invalid for obviousness if 'differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.'" *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1349 (Fed. Cir. 2001) (quoting 35 U.S.C. § 103(a)). Obviousness is a legal conclusion based on underlying findings of fact. *In re Mettke*, 570 F.3d 1356, 1358 (Fed. Cir. 2009) *(Mettke)*. Underlying factual considerations include: (1) the scope and content of the prior art, (2) the differences between the prior art and the claims, (3) the level of ordinary skill in the relevant art, and (4) any objective indicia of non-obviousness, such as commercial success, long felt need, and failure of others. *Id.* at 1359 (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)).

The determination of the likelihood of success on the merits of a patent claim against an assertion of invalidity based on obviousness also involves a two-step process: first, the claims are properly construed and, second, the claims are compared to prior art. "A patent holder seeking a preliminary injunction bears the ultimate burden of establishing a likelihood of success on the merits with respect to the patent's validity." *Altana Pharma AG v. Teva Pharmaceuticals*

10

*USA, Inc*, 566 F.3d 999, 1005 (Fed. Cir. 2009). "If the alleged infringer raises a 'substantial question' of invalidity, the preliminary injunction should not issue." *Id*. at 1005-06. To raise a substantial question as to a patent's validity, the alleged infringer must show only that the patent is vulnerable. *Id*. at 1006. If that showing is made, the burden shifts back to the patentee "to show that the defense lacks substantial merit." *Id*.

The party opposing the injunction need not show actual invalidity: "Vulnerability is the issue at the preliminary injunction stage, while validity is the issue at trial. The showing of a substantial question as to invalidity thus requires less proof than the clear and convincing showing necessary to establish invalidity itself." *Abbott Laboratories v. Andrx Pharmaceuticals, Inc.*, 452 F.3d 1331, 1335 (Fed. Cir. 2006). The party seeking the injunction "must . . . present a clear case supporting the validity of the patent in suit." *Id*.

The following analysis is based on only these requirements. Therefore, because the issues at the preliminary injunction stage and at trial are distinct, the movant's failure to obtain a preliminary injunction stage does not necessarily mean that the plaintiff will be unsuccessful at trial.

## ANALYSIS

As noted above, the primary advance of the NTN, as described in the '708 Patent, is to allow competitive carriers to bypass use of the RBOC tandem network. Instead of being carried by the RBOC network, transit traffic is instead efficiently routed by the NTN from one competitive carrier to another. This basic function of the NTN is shown in a diagram, created by Peerless but introduced here by NT in support of its argument that Peerless infringes.

11



Local transit is relatively straightforward and easy to deliver and bill

Peerless Network Confidential

The diagram displays four options for routing traffic from Carrier #1 to Carrier #2: the ILEC (RBOC), a direct connection, Neutral Tandem (using the NTN), and Peerless. As clearly shown, in the context of routing transit traffic, the NTN has exactly the same function as the RBOC/ILEC tandem network. Indeed, NT states in its discussion of the diagram "if two carriers cannot use a direct connection between them, the traffic would have to be transited through the ILEC's network *in the same manner as provided by Neutral Tandem.*" (NT's memorandum, Doc 78-1 at 3) (emphasis added).

Thus, the essential development of the NTN is that it allows competitive carriers without a direct connection between them to avoid use of the RBOC network to complete calls. This is also apparent from NT's arguments in its written submissions, its presentations at both hearings

12

and from the '708 Patent itself. Throughout, NT emphasizes the technical and economic disadvantages of required use of the RBOC network.

During claims construction, NT argued that the NTN's ability to reduce reliance on the RBOC network was central to the '708 Patent. In that regard, NT proposed to construe the '708 Patent Claim 1 term "managing the efficient routing of transit traffic between said plurality of tandem access points and said switch" to mean "managing transit traffic into, out of and throughout the claimed network *by reducing the customer carriers' reliance on the RBOC/ILEC network.*" (emphasis added). The Court accepted NT's proposed construction. In the order construing the '708 Patent claims, the Court noted that relevant evidence "must also be considered in the context of the then state of telecommunications regarding the dependence of other carriers on the RBOC tandem proprietary network." (Feb. 10, 2010, Order, p. 7, Doc. # 187.) The question, then, in the obviousness analysis, is whether this concept of providing an alternative to the RBOC tandems was original to the '708 Patent or was present in prior art.

Arguing that the concept was present in prior art, Peerless points to various actions related to the FCC's efforts in the early 1990s to increase competition in the telecommunications marketplace. Specifically, in April 1993, telecommunications carrier MFS Communications Company, Inc. ("MFS") presented the FCC with comments (the "MFS Comments") soliciting the adoption of the FCC's proposal to require LECs (or RBOC's) to provide the tandem signaling necessary to allow carriers to compete with the RBOC in providing tandem switched transport to RBOC end offices. Diagrams 2 and 3 from the MFS Comments indicate the proposed changes.

13



## Dedicated Transport
## Expanded Interconnection

DIAGRAM 2

IXC A      IXC B

Serving Wire Center      Serving Wire Center

Tandem Office

End Office 1      End Office 2

——— Dedicated Transport (LEC)
⸺ Common Transport (LEC)
- - - - Dedicated Transport (CAP)
▢ Collocation Node



## Expanded Interconnection
## With Tandem Switching Competition

DIAGRAM 3

IXC A      CAP Tandem Office      IXC B

Serving Wire Center      Serving Wire Center

LEC Tandem Office

End Office 1      End Office 2

——— Dedicated Transport (LEC)
⸺ Common Transport (LEC)
- - - - Dedicated Transport (CAP)
········ Common Transport (CAP)

14

The MFS Comments addressed the methods by which IXCs could connect to customers of RBOCs to complete calls. Historically, an IXC could either connect to the RBOC tandem office, from which point the call would proceed to the RBOC end office and from there to the RBOC customer; or the IXC could connect directly to the RBOC end office, using dedicated lines. The MFS comments suggest increasing competition such that IXCs would not have to rely on RBOC lines to reach the RBOC's end offices. Instead, they could use third-party carriers, known as Competitive Access Providers ("CAPs"). At the time of the MFS Comments, CAPs could provide only direct-trunked transport (i.e., transport on dedicated lines) to either the RBOC tandem or the RBOC end office. By contrast, RBOC could provide either direct-trunked transport or switched transport. This situation is shown in Diagram 2 above. Non-switched connections maintained by the RBOC are shown in bold solid lines; RBOC-switched transport is shown in double solid lines (labeled "common transport"); and dedicated CAP transport is shown in dashed lines. As shown, CAPs could not provide switched service.

The MFS Comments proposed the network depicted in Diagram 3. Diagram 3 adds a CAP tandem office at the top center of the diagram. The CAP tandem office is connected to multiple IXCs via CAP dedicated transport lines. It is also connected to the RBOC end offices via switched transport. Thus, if an IXC lacks a direct dedicated connection to an RBOC end office, the IXC can use either the RBOC tandem office or the CAP tandem office to complete the call. Thus, under the system proposed in the MFS Comments, CAPs would compete with the RBOCs in the provision of tandem-switched service to RBOC end offices.

In 1994, the FCC issued the 91-141 Transport Phase II Order ("Phase II Order"), which required LECs to provide CAPs, IXCs and end users with the signaling information necessary to

15

provide tandem switching, as suggested by the MFS Comments. The Phase II Order allowed third parties, such as CAPS, to "carry traffic of multiple IXCs from LEC end offices to their own tandems, switch the traffic at that point, and deliver the traffic to the appropriate IXC." (Phase II Order ¶ 1.) The order "open[ed] the door to third parties to provide competitive tandem-switching services." (*Id.* at ¶ 2.)

Thus, the concept of providing competition to RBOC tandem switches by enabling carriers to bypass those RBOC tandem switches is found in prior art. Indeed the FCC envisioned nearly identical benefits from the Phase II Order as NT foresaw with the NTN and the '708 Patent: increased competition, technological innovation and improved network reliability.

NT argues that the Phase II Order is not relevant prior art because the problem addressed in the order is distinct from the problem addressed in the '708 Patent: the 1994 Phase II Order was concerned with creating an alternative to RBOC tandem switches in connecting IXCs to RBOC end offices; the '708 Patent is concerned with creating an alternative to RBOC tandem switches to connect competitive carriers to other competitive carriers. However, in both the 1994 Phase II Order and the '708 Patent, the goal is to provide an alternative to using the RBOC tandem switches. In both cases, the solution is to route calls through an alternate pathway – in one case, the CAP tandem; in the other, the NTN.

NT argues that the Phase II Order merely provided for the substitution of one tandem for another specifically, it replaced the RBOC tandem with the CAP tandem. NT points out that the MFS Comments state that the proposed changes will "allow[] a competitor to install its own tandem switching capacity and thereby aggregate traffic on their facilities *as efficiently as the LEC* [RBOC] *does now.*" (MFS Comments at ¶ 5) (emphasis in NT memo). Neither the MFS

16

Comments nor the Phase II Order, NT argues, disclose a network "managing the efficient routing of transit traffic" as the '708 patent does. However, as noted above, this "efficient routing" was construed, in accordance with NT's proposed claims construction, as reducing the customer carriers' reliance on the RBOC/ILEC network. Under this construction, considered in context, the system proposed by the MFS Comments and implemented by the Phase II Order does indeed provide for the "efficient routing of transit traffic" as set out in the '708 Patent, because the Phase II Order allows carriers to reduce reliance on the RBOC tandems.

Furthermore, NT has equated the service provided by the NTN and the RBOC tandem switches. NT states in its brief that "if two carriers cannot use a direct connection between them, the traffic would have to be transited through the ILEC's network *in the same manner as provided by Neutral Tandem.*" Thus, while NT asserts that the Phase II Order merely substitutes one tandem for another, in that sense, the '708 Patent merely substitutes the NTN for the RBOC tandem. To the extent that the network described in the '708 Patent is an alternative to the RBOC tandem network, it is proposing nothing new.

However, accepting for the moment NT's position that the system described in the '708 Patent is distinguishable from the arrangement proposed in the MFS Comments – that is, the '708 Patent proposes to bypass the RBOC tandems in connecting competitive carriers, whereas the MFS Comments propose to bypass the RBOC tandems in connecting a competitive carrier to the RBOC end office – the question becomes whether this distinction is material. A comparison of Diagrams 2 and 3 from the MFS Comments with Figures 9 and 11 of the '708 Patent reveals marked similarities. In both initial stages (i.e., Diagram 2 and Figure 9), multiple competitive carriers are connected to one or more LEC tandem switches. In both post-implementation

17

depictions (i.e., Diagram 3 and Figure 11), the competitive carriers have made connections to an alternative intermediary – the CAP tandem or the NTN. Thus, the two sets of diagrams are schematically equivalent. In both Diagram 3 and Figure 11, the competitive carriers are connected via the RBOC tandem system *and* through an alternative connection – either the CAP tandem or the NTN.

Admittedly, there is no suggestion in the MFS Comments that the two IXCs in Diagram 3 would connect via the CAP; the comments concerned connecting to RBOC end offices. But as NT admits, the problem of interconnecting a multitude of competitive carriers did not exist at the time of the MFS Comments in 1993; the proliferation of telecommunication carriers did not begin until after 1996. Thus, the question becomes whether a person of ordinary skill, looking at Diagram 3 of the MFS Comments, post-1996, would realize the possibility that two competitive carriers -- in Diagram 3, the two IXCs – could connect via a tandem other than the RBOC tandem -- specifically, the CAP. There is a significant possibility that a person of ordinary skill would find this to be obvious. That person would know that competitive carriers often rely on RBOC tandems to carry transit traffic between them. A person of ordinary skill would see that Diagram 3 shows both IXCs connected to the RBOC tandem (as in Figure 9) and that both IXCs were connected to the CAP tandem (as all competitive providers are connected to the NTN in Figure 11). Indeed, Peerless's expert, Michael Starkey, testified that the connections depicted in Diagram 3 would allow the two IXCs to connect to one another. (Tr. at 307-08.) This testimony was credible and persuasive. Thus, it is obvious, pursuant to the criteria set out above, that the CAP tandem could provide an alternative to the LEC tandem in connecting the IXCs.

Furthermore, Peerless has presented evidence that at least two companies provided this service before the '708 Patent's Priority date, March 1, 2001. Specifically, Defendant John Barnicle submitted a declaration that a company he founded in 1996, Focal Communications ("Focal"), offered tandem-switched services for wireless providers, acting as an intermediary delivering communications traffic from these wireless providers to long distance carriers. Focal's tandem-switched access services acted as an intermediate switch between two other carriers, all within the same LATA , thereby providing an alternative to the RBOC/ILEC network. Barnicle's declaration states that Focal provided these services as early as 1999. Peerless also submitted the declaration of Robert Sherlock, which makes similar averments. Sherlock states that he is Vice President of Engineering for Iowa Network Services ("INS"). INS, according to Sherlock, provided tandem-switched access services that "eliminated reliance on RBOC tandems for long distance calls to and from" independent carriers in Iowa. (Sherlock Decl. at ¶ 4.) By 2000, Sherlock states, INS provided intraLATA services "to exchange calls between wireless carriers and [CLECs], between CLECs and IXCs, and between wireless carriers and IXCs, with the LATAs." (*Id.* at ¶ 6.)

NT does not refute the substance of this evidence but, rather, argues that the Court should consider neither declaration because they are not supported by documents demonstrating the truth of the assertions concerning the tandem switching services allegedly provided by Focal and INS. NT's argument is not persuasive. Barnicle's declaration is consistent with his testimony during the preliminary injunction hearing. Barnicle testified that Focal "connected to wireless telephone companies' switches and . . . took various forms of traffic . . . and exchanged those calls with long distance carriers . . . ." (Tr. at 389.) Counsel for NT had the opportunity to cross-examine

19

Barnicle about this testimony but chose not to. Nor, as noted above, has NT offered any written argument against the substance of Barnicle's assertions. Thus, his statement in this testimony and his declaration stand unrebutted and are credible and persuasive. Similarly, Sherlock's averment that INS provided a similar service is corroborated by a district court opinion discussing local transit traffic provided by INS. *See Rural Iowa Independent Telephone Ass'n v. Iowa Utilities Bd.*, 385 F. Supp. 2d 797, 799 (S.D. Iowa 2005).

In summary, considering the scope and content of prior art and in comparison to the '708 Patent, the concept of providing an alternative to RBOC tandem switches is clearly present in the prior art. The MFS Comments and Phase II Order establish that the prior art included use of non-RBOC tandem switches to compete with RBOC tandem switches in the routing of calls from competitive carriers to RBOC end offices. It is also apparent that other non-RBOC telecommunication companies were providing local switched transit service prior to 2000. Indeed, considering the limited evidence presented to the Court, it appears this practice may have been somewhat common.

Furthermore, Peerless's assertion that the '708 Patent's claims "do not represent invention of any of the claimed network components or their arrangement, including without limitation: the tandem switch, the soft switch, using a soft switch as a tandem switch, fiber optic facilities, transit traffic switches together, or even the concept of a non-RBOC alternative tandem services provider" (Peerless Closing Argument Br. at 2) is unrebutted. Notably, NT does not

20

contend that the specific arrangement of the network components is worthy of patent protection.[7] Instead, NT asserts that the purpose of the '708 Patent is to provide an alternative to the RBOC network: "The innovation of the [sic] Neutral Tandem's 708 patent lies in the way in which these components [switches, fiber optic cables, etc.] are put together in an architecture that performs a specific function -- *efficiently routing transit traffic as an alternative to the RBOC/ILEC network*, as required by the claims at issue." (NT Reply Closing Argument Br. at 3) (emphasis added). But this is indistinguishable from prior art, as discussed above. "[T]he efficient routing of transit traffic" means no more than providing an alternative to the RBOC network.

NT argues that the '708 Patent is innovative because it first identified a set of problems with relying on the RBOC tandem system: competitive carriers were either forced to make a number of inefficient connections with the RBOC tandem system (the disadvantages of which have been discussed) or to establish dedicated connections between themselves. The '708 Patent claims to solve this problem by allowing all carriers to connect directly to the NTN, at one location, thereby eliminating the need for this tangled web of connections. But this problem and solution are as old and as simple as switched traffic itself. As noted in the initial discussion of switched and non-switched networks, the problem of an increasing number of end users (or carrier networks) that all need to connect to one another is solved by the use of a switch -- or, in the case of connections between networks, a tandem switch. The '708 Patent essentially proposes the same thing: a tandem switch (or network of such switches - Peerless accomplishes

---

[7]NT argues that the NTN routes traffic in a "fundamentally different way." (NT Reply Closing Argument at 5.) However, nowhere does NT specify how the NTN's routing of transit traffic is fundamentally different, other than the fact that NT is not a RBOC or ILEC.

21

the same result with a single switch) that connects to all customer carrier networks, thereby allowing them to avoid establishing direct, dedicated connection to one another.

Finally, the "any objective indicia of non-obviousness such as commercial success, long felt need, and failure of others" must be considered. *Mettke*, 570 F.3d at 1358. NT argues that its commercial success indicates that the NTN could not have been obvious. This argument is not convincing for purposes of awarding preliminary injunctive relief. As NT notes, the legislative change that led to the proliferation of competitive carriers occurred in 1996. Thus, the opportunity for the NTN or something equivalent to it, according to NT's own reasoning, would only exist at a sufficient time after 1996 when competitive carriers could be established. Furthermore, as discussed above, it appears that other companies, such as Focal and INS, have been offering services similar to those offered by NT, though perhaps not on as large a scale. In any case, this factor is significantly outweighed by other considerations, including the scope and content of the prior art and a comparison of the '708 Patent to prior art, discussed above.

In summary, for the above-stated reasons, the Court finds that Peerless has shown the '708 Patent to be vulnerable due to obviousness and has, therefore, raised a substantial question as to the '708 Patent's validity. NT has not shown that Peerless's challenge to the '708 Patent's validity lacks substantial merit. Therefore, NT has failed to meet its burden of showing a likelihood of success on the merits, and its motion for the issuance of a preliminary injunction is

22

denied. Because the Court finds that NT has not shown a likelihood of success on the merits, it is unnecessary to address the other factors considered in the issuance of a preliminary injunction.[8]

## CONCLUSION

For the foregoing reasons, NT's motion for a preliminary injunction is denied.

Dated: _March 30, 2010_

JOHN W. DARRAH
United States District Court Judge

---

[8]Even if this were not so, NT has also failed to meet its burden with respect to the second showing required for the issuance of a preliminary injunction, irreparable harm – or inadequacy of a legal remedy. NT argues that it will lose ▮▮▮▮▮▮▮▮ without a preliminary injunction and that Peerless will not have sufficient revenues to pay these damages. This argument is unpersuasive for two reasons: (1) NT's claimed damages are unsupported in the record; and (2) NT's claimed damages are contradicted by NT's assertions regarding Peerless's potential losses were an injunction to issue. NT argues that only ▮▮▮▮▮▮▮ of Peerless's revenues, or ▮▮▮▮▮▮▮ over eight months, comes from the allegedly infringing service. This amount does not support a loss to NT of ▮▮▮▮▮▮▮ before the time of trial in September 2010.

Finally, if it were necessary to reach the question of the public interest, protecting valid patent rights must be balanced against ensuring fair competition. Competition in the telecommunications market for transit traffic is in the public interest since it produces lower prices and a higher level of service to consumers.

23