UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NEUTRAL TANDEM, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PEERLESS NETWORK, LLC; PEERLESS NETWORK | ) | |
| of ILLINOIS, LLC; and JOHN BARNICLE, | ) | No. 08 C 3402 |
| | ) | |
| Defendants. | ) | Judge John W. Darrah |
| | ) | |
| | ) | |
| PEERLESS NETWORK, LLC; PEERLESS NETWORK | ) | |
| of ILLINOIS, LLC; and JOHN BARNICLE, | ) | |
| | ) | |
| Counterclaim Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NEUTRAL TANDEM, INC., | ) | |
| | ) | |
| Counterclaim Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Neutral Tandem, Inc. ("NT"), brought suit against Defendants, Peerless Network, LLC; Peerless Network of Illinois, LLC; and John Barnicle (collectively, "Peerless"), alleging infringement of NT's U.S. Patent No. 7,123,708 ("the '708 Patent"). Peerless filed a Counterclaim, alleging various claims against NT. Before the Court are the parties' cross-motions for summary judgment. NT has moved for summary judgment on Count I of the Complaint (infringement), Count I of the Counterclaim (non-infringement), Count III of the Counterclaim (unclean hands, inequitable conduct and patent misuse) and Peerless's Ninth

Affirmative Defense (inequitable conduct). Peerless has moved for summary judgment on NT's claim of infringement and Peerless's Counterclaim for a declaration of non-infringement and invalidity of the '708 Patent.

## BACKGROUND[1]

The '708 Patent concerns the efficient routing of transit traffic. Transit traffic is generally defined as traffic between two telecommunication carriers that is carried by a third carrier. In the claims construction phase of this litigation, the Court construed the term "transit traffic" as it is used in the '708 Patent more narrowly, to add the requirement that the traffic be transited within a local area.

The '708 Patent addresses the problem faced by telecommunications carriers in connecting with one another within a local area, or LATA[2], in order to complete calls. According to NT, before the '708 Patent, carriers had two possible ways to interconnect. First, each carrier could establish a direct connection with every other carrier. However, this option quickly becomes costly as the number of carriers increases. Alternatively, the carriers could connect through the RBOC/ILEC tandem network.[3] However, this option requires that the

---

[1] A more extensive description of the '708 Patent and telecommunications systems in general can be found in the Court's February 8, 2010 Memorandum Opinion and Order regarding claims construction and the Court's March 30, 2010, Memorandum Opinion and Order denying NT's motion for a preliminary injunction.

[2] A LATA is a particular geographic area, identified by a 3-digit number. "IntraLATA" refers to connections made within the same LATA. "InterLATA" refers to a connection between a carrier in one LATA to a carrier in another LATA – essentially, a long-distance call.

[3] The RBOC/ILEC tandem network is the telecommunications network owned and maintained by companies providing local phone services – "Local Exchange Carriers" or "LECs." Those LECs that were in existence at the time of the 1984 breakup of AT&T are known as "Incumbent Local Exchange Carriers" or "ILECs." Those ILECs that were part of the AT&T

carrier connect to every tandem switch in the ILEC's network. Furthermore, it requires the carrier to rely on the ILEC, with which it may be competing, to provide service to its customers. The '708 Patent, NT argues, provides a solution in that carriers may establish a single connection to a "Neutral Tandem Network" ("NTN"). The NTN allows the carrier to complete calls to all other carriers connected to the NTN, thereby reducing reliance on the RBOC/ILEC network.

## LEGAL STANDARD

Summary judgment is appropriate when there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (*Celotex*). Thus, although the moving party on a motion for summary judgment is responsible for demonstrating to the court why there is no genuine issue of material fact, the non-moving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate, through specific evidence, that there remains a genuine issue of material fact and show that a rational jury could return a verdict in the non-moving party's favor. *Celotex*, 477 U.S. at 322-27; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-56 (1986) (*Anderson*); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (*Matsushita*); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994).

---

monopoly are also referred to as "Regional Bell Operating Companies" or "RBOCs." LECs that have entered the market since the breakup are known as "Competitive Local Exchange Carriers" or "CLECs." Also relevant to this case are "Interexchange carriers" or "IXCs," which are long-distance carriers.

Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992). When reviewing a motion for summary judgment, a court must view all inferences to be drawn from the facts in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 247-48; *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999). However, a metaphysical doubt will not suffice. *Matsushita*, 475 U.S. at 586. If the evidence is merely colorable or is not significantly probative or is no more than a scintilla, summary judgment may be granted. *Anderson*, 477 U.S. at 249-250.

## ANALYSIS

The Court turns first to Peerless's motion for summary judgment. Peerless first argues that the '708 Patent is invalid for numerous reasons. "[A] moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise." *Eli Lilly and Co. v. Barr Laboratories, Inc.*, 251 F.3d 955, 963 (Fed. Cir. 2001). "The evidence submitted by the nonmovant, in opposition to a motion for summary judgment, is to be believed, and all justifiable inferences are to be drawn in its favor." *Tone Bros., Inc. v. Sysco Corp.*, 28 F.3d 1192, 1196 (Fed. Cir. 1994) (internal quotation omitted).

### *Prior Public Use*

Peerless asserts that the '708 Patent is invalid due to prior use under both § 102(a) and § 102(b). Under 35 U.S.C. § 102: "[a] person shall be entitled to a patent unless – (a) the invention was . . . used by others in this country . . . before the invention thereof by the applicant for patent, or (b) the invention was . . . in public use . . . in this country, more than one year prior to the date of the application for patent in the United States . . . ." 35 U.S.C. § 102(a), (b). The

4

Federal Circuit has explained that § 102(a) "establishes that a person can not patent what was already known to others. If the invention was known to or used by others in this country before the date of the patentee's invention, the later inventor has not contributed to the store of knowledge, and has no entitlement to a patent." *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1370 (Fed. Cir. 1998) (*Woodland*). By contrast, § 102(b) "is primarily concerned with the policy that encourages an inventor to enter the patent system promptly, while recognizing a one year period of public knowledge or use or commercial exploitation before the patent application must be filed. Thus, an inventor's own prior commercial use, albeit kept secret, may constitute a public use or sale under § 102(b), barring him from obtaining a patent." *Id.* As the examples of prior public use cited by Peerless were all by someone other than the inventor of the '708 Patent, § 102(a) would appear to be the relevant provision here. *See* 1-3 Chisum on Patents § 301 (2010) (Section 102(a)'s requirement that an invention has not been "known or used by others in this country" concerns novelty, whereas the "statutory bar" of § 102(b) "relate[s] to events and acts by the inventor or by other persons prior to the date when the inventor applies for a patent" and concerns "tardiness in applying for a patent.").

The first instance of alleged prior use identified by Peerless was by Focal Communications Corporation ("Focal"). Focal, a CLEC co-founded by Defendant Barnicle, initiated telecommunications services in May 1997. Peerless argues that prior to March 1, 2001, the invention date of the '708 Patent, Focal practiced each claim of the '708 Patent or its practice rendered such claims obvious. With respect to Claim 1 of the '708 Patent, Peerless argues that the Focal network (1) included distributed switches; (2) connected to carrier networks, including ILEC tandems and end offices, and used tandem access points to connect the Focal network to

the networks of other carriers; and (3) utilized optical fiber facilities to connect its customers, its own switches and its tandem access points. Further, Peerless argues that Focal provided at least three services that "managed the efficient routing of Transit Traffic" as that term was construed by the Court. First, Focal provided intra-LATA switched access service, providing a redundant path that was used to transit IXC traffic to ILEC tandem and/or end offices ("Intra-LATA switched access services"). Second, Focal allowed any carrier connected to its network to terminate traffic anywhere in the LATA to any other carrier ("LATA-wide termination services"). Third, Focal provided 8YY (e.g. "1-800") origination services to its carrier customers, whereby traffic from a wireless carrier was transmitted to that IXC that owned the 8YY number ("8YY wireless origination services").

NT's primary response is that Peerless has not sufficiently shown that Focal actually provided these services prior to March 1, 2001. NT argues that Peerless's only evidentiary support for their factual claims is the declarations of three interested witnesses and a single unauthenticated PowerPoint presentation. Furthermore, NT has introduced the declarations of three former Focal employees, Ronald Flynn, Brett Scorza and David Tatak, which state that Focal did not provide services noted above as alleged by Peerless's witnesses.

In reply, Peerless argues that Flynn, Scorza and Tatak did not have complete knowledge of Focal's operations. That these three individuals were unaware that Focal offered the above-noted services, Peerless argues, does mean that Focal did not provide those services. Rather, Peerless suggests, if Flynn, Scorza and Tatak did not know that Focal was providing these services, it was because other Focal employees were the ones responsible for providing the service.

Peerless's argument on this point is not persuasive. First, considering the job titles and responsibilities of NT's three witnesses, Peerless's proposed scenario – that they were out of the loop – appears unfounded. Secondly, all three witnesses state that, had Focal provided these services, they each would have been in a position to know of it. Scorza, for example, was Vice President of Information Technology at Focal. Scorza states that he "was the employee responsible for the development of the internal billing systems Focal used to bill for certain services" and that, as a result of his work, he has "personal knowledge concerning how Focal billed for all of its services." (Scorza Aff. ¶ 4.) Scorza goes on to say that "if Focal had provided any of the services [claimed by Peerless], [Scorza] would have been responsible for developing [billing systems] for those services." (Scorza Aff. ¶ 9.) Similarly, Flynn, Manager of Switch Transitions at Focal, who was responsible for "ensuring the proper switch translations" which "governed how telecommunications traffic was routed into, out of, and throughout Focal's network," stated that the routing of telecommunications traffic described by Peerless's witnesses did not occur. (Flynn Aff. ¶¶ 3, 12, 16.) Likewise, Tatak, who was responsible "for the filing and updating of tariffs that described the products and services Focal made available on a tariffed basis" and who "would have been responsible for the filing of tariffs" of the services Peerless claims Focal provided, "neither filed, nor caused to be filed, any tariffs for such services prior to March 1, 2001." (Tatak Aff. ¶¶ 4, 7.) Furthermore, Tatak produced certain Focal records that purportedly show that Focal did not file tariffs for the alleged services. (Tatak Aff. ¶ 7.)

Considering the affidavits introduced on both sides, there is a disputed issue of material fact as to what services Focal provided prior to March 1, 2001. While it is arguably possible that Scorza, Flynn and Tatak were simply unaware of the full range of services offered by Focal,

based on their affidavits, it appears improbable. Thus, there is a direct conflict between the two sides' witnesses, which cannot be resolved on summary judgment.

Peerless suggests that even if NT has raised issues of material fact with respect to whether Focal provided Intra-LATA switched access services and LATA-wide termination services, they have not done so with respect to Focal's 8YY origination services. Peerless cites Scorza's admission in his affidavit that Focal did provide 8YY origination services prior to March 1, 2001. Scorza's affidavit states, "Prior to March 1, 2001, the '8YY wireless origination services' provided by Focal involved situations in which Focal delivered 8YY-originating traffic to other carriers via *indirect* interconnection. In other words, Focal delivered 8YY-originating traffic to the ILEC, which in turn delivered the traffic to carriers that owned 8YY numbers." (Scorza Aff. ¶ 22) (emphasis in original). While Peerless cites the report of its expert, Michael Starkey, to argue that Focal's 8YY origination services met the definition of transit traffic, the cited sections of Starkey's report do not discuss the type of "indirect interconnection" admitted by Scorza. Rather, Starkey's discussion of 8YY origination services concern only direct connections from the wireless carrier to the 8YY-owning carrier. Thus, Peerless has not shown that the 8YY-originating service admitted by Scorza would qualify as practicing the claims of the '708 Patent under the Court's construction.

Peerless next argues that Iowa Network Services ("INS") practiced the claims of the '708 Patent prior to March 2000. INS is a telecommunications firm headquartered in Des Moines, Iowa. It was formed in 1986 by 128 Iowa telephone companies to provide centralized equal-access services to those companies.

8

Starkey's expert report suggests three ways in which INS practiced Claim 1 of the '708 Patent "managing the efficient routing of transit traffic between said plurality of tandem access points and said switch." Starkey states that "INS used its tandem switches to carry traffic to/from [IXCs] to/from the independent telephone companies in Iowa it was initially formed to serve." (Starkey Decl. ¶ 42.) Starkey also states that "INS connected transit traffic from one independent telephone company to another." (*Id.*) It is not clear that either of these activities would fall under the scope of the '708 Patent. As noted by NT, the Court previously construed the term "managing the efficient routing of transit traffic . . ." to include "reducing . . . reliance on the RBOC/ILEC network." NT's expert, Arthur Brody, asserts, without contradiction, that the 128 Iowa telephone companies that formed INS are themselves ILECs. The two above-noted activities described by Starkey, thus, involve either INS routing traffic from an ILEC to an IXC or between two ILECs. Starkey does not explain how this reduces reliance on the RBOC/ILEC network.

The remaining way Starkey suggests that INS managed the efficient routing of transit traffic was "providing transiting services between wireless carriers and CLECs, between CLECs and IXCs, and between wireless carriers and IXCs." These activities would seem to fall within Claim 1 of the '708 Patent. However, NT has raised doubts as to whether INS actually provided these services. In support of their assertion that INS did provide these services, Peerless relies primarily on the declaration of Robert Sherlock, Vice President of Engineering for INS. In that declaration, Sherlock states, "By the year 2000, Iowa Network Services provided intraLATA transit services where we acted as the tandem switch provider to exchange calls between wireless carriers and [CLECs], between CLECs and IXCs, and between wireless carriers and IXCs, within

9

the LATAs." (Sherlock Decl. ¶ 6.) However, at his deposition, Sherlock testified that INS did not connect to wireless providers until 2004 or 2005. (Sherlock Dep. ¶ 17.) Furthermore, NT has introduced evidence that to the extent INS carried transit traffic, the call was also transmitted through the RBOC network. (Brody Decl. ¶ 137.) Thus, there are material factual disputes regarding the services provided by INS that prevent summary judgment resolution on this issue.

Peerless also suggests that the claims of the '708 Patent are rendered invalid in light of the tandem switching services provided by at least five other carriers. However, Peerless's memorandum in support of their motion for summary judgment contains no argument with respect to these carriers, and Peerless's statement of facts touches on the carriers only briefly. Summary judgment cannot be granted on these assertions because of insufficient factual support.

Therefore, Peerless has not shown that the '708 Patent is invalid due to prior public use.

*Anticipation by Prior Art*

Peerless argues that all claims of the '708 Patent are invalid as anticipated by the Wiley Patent (U.S. Patent No. 6,137,800) and the Cheesman Patent (U.S. Patent No. 6,282,194). "Anticipation under 35 U.S.C. § 102 means lack of novelty." *Brown v. 3M*, 265 F.3d 1349, 1351 (Fed. Cir. 2001). "Although anticipation is a question of fact, it still may be decided on summary judgment if the record reveals no genuine dispute of material fact." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1327 (Fed. Cir. 2001). "Summary judgment is proper if no reasonable jury could find that the patent is not anticipated." *Id.*

Peerless first argues that the '708 Patent is anticipated by the Wiley Patent. Peerless argues that the tandem function technology described in the '708 Patent is the same as that described in the Wiley Patent. Specifically, Peerless asserts that both the '708 and Wiley patents

10

"describe a tandem network based on a broadband system for connecting a call over an optical fiber ring, that is adapted to interconnect devices and switches, including tandem switches of other carriers, coupled to the ring." (Br. at 9.) Peerless points to Figure 1 of the Wiley Patent (set out below), which shows "a non-RBOC tandem network that includes at least one switch including distributed switching elements constituting broadband interfaces and a signaling processor that connect at tandem access points to a plurality of carrier network switches, including the ILEC tandem switch 154, over a Synchronous Optical Network ("SONET"), or optical fiber ring." (*Id.* at 10.)



*FIG. 1*

Peerless argues that "this arrangement of network elements is identical to that shown in Figure 11 and recited in Claims 1-23 of the '708 patent." (*Id.*)



Further, Peerless argues that the system described in the Wiley Patent "manages the efficient routing of transit traffic." The term "transit traffic" was construed to mean "traffic between one telecommunications carrier and another such carrier, transmitted by a third carrier in a local region regardless of any other transport of the call." The Wiley Patent, according to Peerless, states that the broadband system depicted in Figure 1 is "connected to ILEC 154, CLEC 158, and IXCs 150 and 162, and used to route calls between these and other carrier networks." (*Id.* at 11.) Furthermore, Peerless argues, this transit of the calls may take place within a local region because the Wiley system may be deployed as a "broadband metropolitan area network"

or "BMAN." Finally, the Wiley system "manages the efficient routing of transit traffic" in that its use to transit calls between CLECs or between a CLEC and an IXC reduces reliance on the ILEC network.

A review of Figure 1 of the Wiley Patent reveals close similarities with Figure 11 of the '708 Patent. Figure 11 depicts how the invention of the '708 Patent, the Neutral Tandem Network ("NTN"), provides connection between the networks of multiple telecommunication companies, including CLECs, wireless providers, IXCs and ILECs. The '708 Patent describes how these networks may all interconnect by use of the NTN without need for either a direct connection or use of the ILEC/RBOC network. Similarly, Figure 1 of the Wiley Patent "illustrates the broadband system 102 of the present invention," which "switches telecommunication call traffic between networks, switches, and elements of the broadband system" and "allows switches and other communication devices to connect to each other without a direct connection to each switch and communication device." (Wiley at 8:29-35.) Figure 1 depicts a ring of "broadband interfaces," any of which "may reach any other broadband interface in the broadband ring." (*Id.* at 8:46, 65-66.) Each broadband interface "may be connected to a switch or to another communication device." (*Id.* at 9:13-15.) In Figure 1, the broadband interfaces are shown as connected to a CLEC, an ILEC, two IXCs and two communication devices. However, the Wiley Patent recognizes that "larger networks have many more components than those shown in [Figure 1]," that "there may typically be a multitude of switches and communication devices connected through the broadband system,"and that "the invention is fully applicable to a large network or a small network." (*Id.* at 10:6-15.) Thus, while Figure 1

shows the Wiley system to connect to one CLEC and two IXCs, the patent contemplates connections to multiple CLECs and IXCs.

NT argues that there are material factual disputes as to what the Wiley reference discloses. NT offers the declaration of Brody, who makes several arguments for why the Wiley Patent does not anticipate the '708 Patent. The majority of Brody's arguments concern the reasons why, in his opinion, the Wiley Patent does not disclose "a network managing the efficient routing of transit traffic."[4] NT, relying on Brody, argues that Wiley does not disclose transit traffic. As noted above, the Court construed "transit traffic" to mean "traffic between one telecommunications carrier and another such carrier, transmitted by a third carrier in a local region regardless of any other transport of the call." Putting aside for a moment the limitation that the traffic is transmitted "in a local region," it must first be determined whether the Wiley Patent discloses traffic from one carrier to another carrier transmitted by a third carrier. NT, supported by Brody's declaration, argues that it does not.

Examination of the Wiley Patent, particularly Figure 1 and the related text, would suggest otherwise. As noted above, the Wiley system is essentially a ring of broadband interfaces, each of which is connected an to IXC, a CLEC, an ILEC or a communication device. After noting several possible connections that can be made via the Wiley system (e.g. the CLEC to the ILEC,

---

[4]As Peerless points out, Brody has essentially conceded that the disclosure of "a network managing the efficient routing of transit traffic" is what sets the '708 Patent apart from the Wiley Patent. Brody states, "In my opinion, in relevant respects, Wiley is no different from Christie." (Brody Decl. ¶ 253) ("Christie" is U.S. Patent 6,999,463, which the Patent Office considered in granting the '708 Patent.) Brody continues, "During the prosecution, the PTO allowed the claims of the '708 patent as novel and not obvious over the disclosure of Christie and the same result applies with respect to Wiley." (*Id.* ¶ 253.) Brody then states, "Like Christie, Wiley does not meet the '708 patent limitation of a 'network managing the efficient routing of transit traffic.' It is this limitation that persuaded the examiner to allow the claims." (*Id.* ¶ 256.)

14

the ILEC to the CLEC and between the ILEC and the first IXC), the Wiley Patent states, "a call may be completed between any of the elements in the broadband system." (Wiley at 11:54-55.) Thus, it is reasonable to conclude that the Wiley system is carrying transit traffic, i.e., traffic between two other carriers.

To avoid this conclusion, NT and Brody are forced into a strained interpretation of the Wiley Patent. NT argues that the Wiley system is not a third-party network; rather, NT argues, the Wiley system is itself an IXC carrier network with direct connections to a CLEC and an ILEC. Under this interpretation, the IXCs shown in Figure 1 are merely other parts of the same IXC network. Thus, traffic from either IXC to the other IXC or to either the CLEC or the ILEC would not be transit traffic because the IXCs and the Wiley system itself are all part of the same IXC network. Thus, in Brody's view, there is no third-party carrier, only one carrier directly connecting to another by use of the Wiley system.

In support of his interpretation that the IXCs shown in Figure 1 and the Wiley system are all part of the same network, Brody points out that the assignee of the Wiley Patent is Sprint Communications Company, L.P., an IXC. According to Brody, this shows that the Wiley system is intended to be incorporated into an IXC network. Furthermore, Brody points to the Wiley Patent's descriptions of the IXCs to support his view: "The first and second IXCs comprise communication devices that can transport, receive and handle calls. The first and second IXCs 150 and 162 may be connected to other IXCs, local exchange carriers (LECs), or other communication devices." (Brody Decl. ¶ 234 (quoting Wiley at 10:60-64).) According to Brody, "[t]his means that IXCs 150 and 162 could simply be repeated parts of the IXC carrier incorporating Wiley." (Brody Decl. ¶ 234.)

Brody's argument is not convincing. Explaining Figure 1, the Wiley Patent states, "The third broadband interface 110 is connected to a first interexchange carrier (IXC) .... The sixth broadband interface 115 is connected to a *second* IXC." (Wiley at 9:20-27) (emphasis added). The most reasonable reading of this text is that the two IXCs shown in Figure 1 represent two separate interexchange carriers rather than two parts of the same network. Furthermore, the most Brody will say is that "IXCs 150 and 162 *could* simply be repeated parts of the IXC carrier incorporating Wiley." (Brody Decl. ¶ 234) (emphasis added). Thus, Brody does not deny the possibility that the Wiley Patent could be implemented such that the Wiley system would connect to IXCs that were not part of the same network as the Wiley system.

Furthermore, even if Brody's interpretation of the IXCs in Figure 1 were correct so that the Wiley system did not connect to any unrelated IXCs, the Wiley Patent would still disclose transit traffic. As shown, the Wiley system would still route traffic between the ILEC and the CLEC. Furthermore, because the Wiley Patent contemplates connections to more networks than are shown in Figure 1 (for example, connections to multiple CLECs), the patent also contemplates traffic between CLECs carried on the Wiley system. This routing of calls meets the broader definition of transit traffic, i.e., traffic between one carrier and another carrier, transmitted by a third carrier.

The next question is whether the Wiley Patent discloses transit traffic as more narrowly construed by the Court, in that the transmission by the third party is within a local region. That question must also be answered in the affirmative. The Wiley Patent states that "[t]he broadband system 120 may be, for example, a broadband *metropolitan area network*." (Wiley at 8:35-37) (emphasis added). Similarly, the '708 Patent itself states that it relates to "a telecommunications

16

system for providing a neutral *metropolitan area* tandem switch *network*." ('708 Patent at 1:14-16.) (emphasis added). As Brody has admitted, the term "metropolitan" in this context is equivalent to "local."[5] Thus, both the '708 Patent and the Wiley Patent concern systems that can be deployed within a metropolitan or local area. Putting the matter beyond dispute, the Wiley Patent states, "The broadband system and broadband interfaces may be used to connect and process calls in a local architecture or in an interexchange architecture." (Wiley 18:26-28.) Thus, the Wiley Patent discloses transit traffic in the more limited sense adopted by the Court during claims construction.

The remaining question is whether the Wiley system "manages the efficient routing of transit traffic." As noted, this has been construed by the Court to mean reducing reliance on the ILEC/RBOC network. Each call routed through the Wiley system is a call less routed through the ILEC/RBOC network. Thus, the system reduces reliance on the RBOC/ILEC network.

For the foregoing reasons, the Court finds that NT has not established any material factual dispute the Wiley Patent discloses the claims of the '708 Patent as construed by the Court. Therefore, the Court finds that the '708 Patent is anticipated by the Wiley Patent.[6] It is therefore unnecessary to address the remaining issues raised by the parties.

---

[5]"[T]he claimed network [of the '708 Patent] handles traffic specific to a metropolitan, i.e. local region . . . ." (Brody Decl. ¶ 225.)

[6]The Court notes that this finding is consistent with the PTO's March 26, 2010 Office Action.

## CONCLUSION

For the reasons stated above, the Court finds that the '708 Patent is invalid as anticipated. Therefore, summary judgment is granted in favor of Peerless on NT's claim of infringement in that the '708 Patent is invalid and Peerless does not infringe on any claim of the '708 Patent. NT's motion for summary judgment is denied.

Dated: September 2, 2010

JOHN W. DARRAH
United States District Court Judge